******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE KYLIK A. ET AL.*
(AC 36721)

DiPentima, C. J., and Prescott and Bear, Js.

*Argued September 8—officially released October 16, 2014***

(Appeal from Superior Court, judicial district of Middlesex, Child Protection Session, Rubinow, J.)

*David J. Reich*, for the appellant (respondent mother).

*Frank LaMonaca*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

BEAR, J. The respondent mother, Denice S., appeals from the judgments of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights as to two of her children,[1] Kylik A. and Avion A.[2] On appeal, the respondent claims that the court improperly found that the Department of Children and Families (department) made reasonable efforts to reunify her with the children, and that she was unable and unwilling to benefit from the reunification efforts.[3] We affirm the judgments of the court.

The following facts, which were found by the court, and procedural history are relevant to our review. The respondent's involvement with the department began when she was a child, and she spent two years in foster care due to maternal abuse. The respondent suffered additional childhood trauma through abuse in her foster home, sexual abuse, the death of a close relative, and bullying at school, and she exhibited behavioral problems in middle school and high school. She suffered from depression as a teenager and received medication. She attended school through the twelfth grade, but did not graduate. Michael A., the children's father, and the respondent met while she was in high school and married in March, 2007. Although the two remain legally married, the respondent was abused physically and verbally by Michael A., and the two separated after the family came to the department's attention in late 2008. The respondent has not had custody of the children since her separation from Michael A., a period of approximately six years as of the date of this opinion.

On January 6, 2009, the petitioner imposed a ninety-six hour hold[4] on the children, removing them from Michael A.'s physical custody and placing them in non-relative foster care. On January 9, 2009, the court granted the petitioner's ex parte motions for orders of temporary custody, which alleged that the children were endangered when the respondent assaulted Michael A.'s girlfriend in front of them. The petitioner filed neglect petitions for the children that same day, alleging that the respondent had an unstable housing history, that she had anger and parenting issues, and that Michael A. had persistent marijuana abuse issues, parenting deficits, and that he needed counseling services. The court, on January 15, 2009, the scheduled hearing date, sustained the ex parte orders of temporary custody with the agreement of each of the respondents, and the children remained in the custody of the petitioner. On May 8, 2009, the court adjudicated the children uncared for and ordered their commitment to the petitioner. The court, on April 20, 2010, modified this disposition, and placed the children with Michael A. under six months of protective supervision, which was terminated on September 16, 2010.

The department, beginning in 2009, provided a number of services, and referrals for services, to the respondent. In 2009, the respondent was involved in a substance abuse treatment program. On June 7, 2010, the respondent started individual counseling and substance abuse treatment at Southwest Community Health Center (SCHC). She was diagnosed with depressive disorder, and she was determined to be unable to cope with her multiple life stressors. After SCHC's psychiatric and psychosocial assessments, the respondent refused to try the recommended medication, claiming to prefer counseling, yet she only sporadically attended subsequent scheduled therapy sessions. In July, 2010, the department referred her to anger management treatment at Connecticut Renaissance. She did not complete the program, however, and was discharged in August, 2010, for nonattendance. SCHC, on March 30, 2011, discharged the respondent because of her failure to progress, and her noncompliance with its requirements and recommendations.

The petitioner imposed a second ninety-six hour hold on the children on December 18, 2010, when Michael A. was arrested for domestic violence against his girlfriend. On December 22, 2010, the court granted the petitioner's ex parte motions for orders of custody, and the children were placed with their paternal aunt. The petitioner filed a second set of neglect petitions that day, alleging that Michael A. had been abusive to the children and that the respondent had not maintained a relationship with the children for six months. On December 30, 2010, the scheduled hearing date, Michael A. agreed to the new ex parte orders of temporary custody. On January 7, 2011, the respondent similarly agreed, the ex parte orders of temporary custody were sustained, and the court ordered specific steps for each of the parents to regain custody of the children.

The department, during 2011, continued to provide the respondent with services and referrals for services. On March 7, 2011, Child Guidance's Reconnecting Families program (RCF) began providing the respondent with one supervised and one therapeutically supervised home visit with the children each week, parenting training with modeling of positive interaction and nurturance for the children, help in meeting the children's medical and practical needs, education in anger management, impulse control, domestic violence prevention, and the negative impact of aggression upon children. RCF assisted the respondent in obtaining employment and adequate housing. The respondent, however, maintained uneven contact with RCF during the spring of 2011, making little progress in developing parenting skills, anger management, or self-sufficiency. This lack of progress was evident on March 30, 2011, when the respondent and her neighbor engaged in a physical altercation very near the respondent's room,

in which the RCF worker and the children were present to celebrate Kylik's birthday. The respondent returned to her room with scratches and ripped clothing after loud arguing, banging, and thudding sounds were heard. The children became nervous and were removed from the situation. The respondent was discharged from RCF on June 29, 2011, for failure to progress when she cancelled the visit scheduled for that day.

In April, 2011, the department gave the respondent money for a security deposit on a one bedroom apartment. The department again referred the respondent to SCHC, but she did not take advantage of the behavioral health services available at that time. It was not until July 6, 2011, that the respondent began treatment at SCHC again. The respondent began SCHC's anger management program, and was diagnosed with generalized anxiety and alcohol abuse. On July 26, 2011, a psychologist conducted a psychological evaluation of the respondent and interactional evaluation with the children. The respondent denied having substance abuse problems, despite testing positive for marijuana. She admitted previous daily marijuana use, but claimed not to have smoked "for a while now." She reported symptoms of anxiety, including panic attacks, but claimed to have missed treatment sessions because of "issues with child care." The psychologist found that the respondent had borderline range intelligence and a lower than average ability to sustain her attention or exert mental control. Her interactions with the children were positive and she remained calm despite their active behavior. She did not appropriately respond and intervene, however, when the children engaged in potentially dangerous conduct. The psychologist found that the respondent needed to complete substance abuse and domestic violence treatment, and to undergo individual therapy for her mental health issues.

On August 9, 2011, while still enrolled in SCHC's anger management program, the respondent was admitted to SCHC's alcohol abuse treatment program. On August 31, 2011, however, the respondent was discharged for sporadic attendance and lack of participation. Similarly, on September 13, 2011, the respondent was discharged from SCHC's anger management program for noncompliance, after missing three sessions and appearing at a morning session highly intoxicated.

In November, 2011, the department referred the respondent to Recovery Management Services for substance abuse services, and to Project Courage for drug treatment and mental health counseling. The respondent began treatment with Project Courage that month. On December 1, 2011, the court adjudicated each of the children neglected for a second time, ordered the children committed to the custody and guardianship of the petitioner, and ordered additional specific steps supplementing the earlier set. As part of the specific

steps, the court ordered the department to notify the respondent's attorney when the respondent did not comply with any specific step.

The department, during 2012, continued to provide the respondent with services and referrals for services. After testing negative for alcohol and drug use on January 18, 2012, the respondent was provided with group and individual therapy services, as well as domestic violence, trauma, and parenting services. The department also referred the respondent to a Supportive Housing program in January, 2012, and informed her of counseling available at the Center for Women and Families (CWF).

On May 30 and 31, 2012, approximately three months after the petitioner filed her petitions to terminate parental rights, a psychologist performed a psychological evaluation of the respondent and an evaluation of her interaction with the children. The respondent presented with post-traumatic stress disorder and depressive disorder, and she admitted that she was still using alcohol and marijuana "to cope with stress," and to "self-medicate emotional hardship." The psychologist found that despite years of supportive services, the respondent still faced difficulties with stress management, employment, and housing. The respondent was appropriately affectionate during the interactional evaluation, and she showed an adequate ability to manage the children in a highly structured environment. She denied parenting problems, however, while simultaneously acknowledging that she gave in to the children's demands, and "that her use of marijuana and alcohol to cope with depression reflected poor decision making."

In August, 2012, the respondent tested negative for all substances. Additionally, in October, 2012, approximately six months after the petitioner filed her petitions to terminate parental rights, the respondent started counseling with CWF to address her relationship issues and showed improvement in personal stability with CWF through February, 2013. This positive development occurred, however, approximately four years after the respondent had voluntarily relinquished physical custody of the children when she separated from Michael A.

In November, 2012, Supportive Housing provided the respondent with a three bedroom apartment, but as of August, 2013, it, instead of the respondent, was still paying the rent and utility bills. The respondent briefly worked at a restaurant after the petitioner's referral of her to employment training, but she has had no other employment.

In addition to these services, the department also provided the respondent supervised visits with the children. After the birth of the respondent's third child, D, in May, 2010, the respondent would often bring him to

the visits. Although her parenting improved between January 24 and September 9, 2011, the respondent displayed difficulty paying adequate attention to D while trying to meet the needs of the children. The respondent missed approximately one visit per month during this period. To reduce the children's distress because of the respondent's failure to attend visits, the department reduced the frequency of visits in September, 2011. The respondent, however, still failed to visit regularly, missing at least one and sometimes two visits per month.

In January, 2012, the department referred the respondent to the Exchange Club for weekly therapeutic visitation and parenting education. The respondent was taught age appropriate activities for the children, necessary safety, structure, and routine, and discipline and behavior management. Although the Exchange Club worked with the respondent for more than one year, she made limited progress, and she cancelled the visits scheduled for July 10, August 14, September 18, October 9, 16 and 23, November 6, and December 18, 2012, in addition to the visits scheduled for January 15 and 22, and February 5, 2013.

The department, during 2013, continued to provide the respondent with services and referrals for services. In March, 2013, the department moved the children's visits to Sunday to accommodate the respondent's restaurant work schedule, but when she left that job, she provided other excuses for her absences from half the scheduled visits. The respondent cancelled visits with the children planned for March 5 and 12, April 2 and 14, May 5, 19 and 23, and June 1 and 23, 2013. The children were out of the state from July 5 to August 7, 2013, but the respondent still did not attend two of the visits available prior to the start of the termination of parental rights trial.

The petitioner, on March 1, 2012, filed petitions to terminate the parental rights of Michael A. and the respondent. The combined termination of parental rights trials occurred on September 4 and 5, 2013, and the court then heard closing arguments on November 27, 2013. In its memorandum of decision filed March 18, 2014, the court found, pursuant to General Statutes § 17a-112 (j) (1), that clear and convincing evidence established both that the department had made reasonable reunification efforts for the benefit of the respondent and that the respondent was unable or unwilling to benefit from these efforts.[5] The court also found that clear and convincing evidence established that termination of parental rights was in the children's best interest, as required by § 17a-112 (j) (2). Finally, the court found, by clear and convincing evidence, that the respondent had failed to achieve sufficient personal rehabilitation and that she had no ongoing parent-child relationship with the children, within the meaning of § 17a-112 (j)

(3) (B) (i) and (D). See footnote 3 of this opinion. The court granted the petitions and terminated the respondent's parental rights as to the children.[6] This appeal followed.

We first set forth the relevant standard of review and the legal principles that inform our analysis. "Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . .

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Anvahnay S.*, 128 Conn. App. 186, 190, 16 A.3d 1244 (2011). With these principles in mind, we turn to the respondent's claims.

The respondent claims that the court improperly found that the department made reasonable efforts to reunify her with the children and that she was unable or unwilling to benefit from the reunification efforts. She argues that both findings were clearly erroneous because the department failed to comply with the court-ordered specific steps by not notifying the respondent's attorney when she did not comply with reunification services. She further argues, with respect to the finding that the department made reasonable efforts, that the court improperly considered reunification efforts only through the date that the petitioner filed the petitions for termination of parental rights rather than the date on which the court approved the permanency plan other than reunification. We disagree.

Section 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition [to terminate parental rights] . . . if it finds by clear and convincing evidence that (1) the [department] has made reasonable

efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, *unless* the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ." (Emphasis added.) "Thus, the department must prove [by clear and convincing evidence] *either* that it has made reasonable efforts to reunify *or, alternatively,* that the parent is unwilling or unable to benefit from reunification efforts. Section 17a-112 (j) clearly provides that the department is not required to prove both circumstances. Rather, either showing is sufficient to satisfy this statutory element." (Emphasis in original; internal quotation marks omitted.) *In re Anvahnay S.*, supra, 128 Conn. App. 191. "[I]n determining whether the department has made reasonable efforts to reunify a parent and a child or whether there is sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date on which the termination petition was filed. . . . This court has consistently held that the court, [w]hen making its reasonable efforts determination . . . is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . ." (Citations omitted; internal quotation marks omitted.) *In re Kyara H.*, 147 Conn. App. 855, 870–71, 83 A.3d 1264, cert. denied, 311 Conn. 923, 86 A.3d 468 (2014).[7]

A careful review of the record reveals that there was clear and convincing evidence to support the court's finding that the respondent was unable or willing to benefit from the department's reunification efforts. The respondent was offered numerous services to aid in attaining reunification, including substance abuse and alcohol treatment, anger management treatment, individual and group counseling, mental health treatment, assistance with employment and housing, financial assistance, parenting education, and supervised and therapeutically supervised visitation. The respondent, however, continually remained unable or unwilling to participate in or to benefit from the services provided, evidenced by her repeated discharges from programs due to noncompliance, nonattendance, and lack of participation, frequent cancellations of scheduled visits, and limited progress despite years of receiving services in programs that she attended. The evidence before the court, thoroughly discussed in its lengthy and detailed memorandum of decision, more than adequately supported its determination that the respondent, as of March 1, 2012, the date the termination of parental rights petitions were filed, was unable or unwilling to benefit from the department's reunification efforts. We, accordingly, conclude that the court's finding was not clearly erroneous. Because we conclude that the court properly found, on the basis of clear and convincing

evidence, that the respondent was unable or unwilling to benefit from reunification efforts, we do not reach the respondent's claim that the court improperly concluded that the department made reasonable efforts to reunify her and the children.

With respect to the respondent's assertion that the department failed to comply with the court-ordered specific steps by not notifying the respondent's attorney when she did not comply with reunification services, except for a department social worker's testimony relating to one issue that the respondent had during her participation in the Exchange Club program in 2012, we were unable to find any evidence in the record to support this assertion.[8] The respondent did not mention this claim in her closing argument to the court, or thereafter.[9] The court was not put on notice that the respondent relied on it, and did not make any findings in that regard.

In summary, after a careful review of the respondent's briefs and the record, we conclude that the respondent did not prove clear error by the court in its finding that the respondent was unable or unwilling to benefit from reunification efforts, which were provided to her over several years prior to March 1, 2012. Accordingly, the trial court did not err in terminating the respondent's parental rights.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** October 16, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The respondent has another child, D, to whom she gave birth in May, 2010. That child, however, is not a party to these proceedings. Therefore, we refer to Kylik A. and Avion A. as the children in this opinion.

[2] Michael A. is the father of both Kylik A. and Avion A., and was a party in the termination proceeding. He did not appeal from the decision of the court terminating his parental rights. Accordingly, we refer to Denice S. as the respondent.

[3] In her brief, the respondent also claims that the court applied an improper standard in determining that she had no ongoing parent-child relationship with the children. See General Statutes § 17a-112 (j) (3) (D). Under § 17a-112 (j), the court may grant a petition to terminate parental rights if the petitioner proves three elements, by clear and convincing evidence. To satisfy the third element of the statute, the petitioner must prove at least one of the grounds for termination enumerated in § 17a-112 (j) (3), by clear and convincing evidence. In its memorandum of decision, the court found both that the respondent had failed to achieve sufficient personal rehabilitation and that she had no ongoing parent-child relationship with the children, within the meaning of § 17a-112 (j) (3) (B) (i) and (D). The respondent does not challenge on appeal the court's finding that she failed to achieve sufficient personal rehabilitation, a finding that provides an independent alternative basis for upholding the court's determination that the requirements of § 17a-112 (j) (3) had been satisfied. We, therefore, do not reach the respondent's claim that the court applied an improper standard in determining that she had no ongoing parent-child relationship with the children. See *In re Daniel A.*, 150 Conn. App. 78, 98, 89 A.3d 1040 (only one of statutory grounds for termination of parental rights need be proved

by clear and convincing evidence), cert. denied, 312 Conn. 911, 93 A.3d 593 (2014).

[4] General Statutes § 17a-101g provides in relevant part: "(e) If the Commissioner of Children and Families, or the commissioner's designee, has probable cause to believe that the child or any other child in the household is in imminent risk of physical harm from the child's surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety, the commissioner, or the commissioner's designee, shall authorize any employee of the department or any law enforcement officer to remove the child and any other child similarly situated from such surroundings without the consent of the child's parent or guardian. The commissioner shall record in writing the reasons for such removal and include such record with the report of the investigation conducted under subsection (b) of this section.

"(f) The removal of a child pursuant to subsection (e) of this section shall not exceed ninety-six hours. During the period of such removal, the commissioner, or the commissioner's designee, shall provide the child with all necessary care, including medical care, which may include an examination by a physician or mental health professional with or without the consent of the child's parents, guardian or other person responsible for the child's care, provided reasonable attempts have been made to obtain consent of the child's parents or guardian or other person responsible for the care of such child. During the course of a medical examination, a physician may perform diagnostic tests and procedures necessary for the detection of child abuse or neglect. If the child is not returned home within such ninety-six-hour period, with or without protective services, the department shall proceed in accordance with section 46b-129. . . ."

[5] A finding of either of these grounds is sufficient to satisfy the requirements of § 17a-112 (j) (1). *In re Jorden R.*, 293 Conn. 539, 556, 979 A.2d 469 (2009) ("either finding, standing alone, provides an independent basis for satisfying § 17a-112 [j] [1]").

[6] The respondent does not challenge on appeal the court's findings that she failed to achieve sufficient personal rehabilitation and that it was in the best interest of each of the children for her parental rights to be terminated. Therefore, the only issue on appeal to be considered is the § 17a-112 (j) (1) claim of the respondent.

[7] Practice Book § 35a-7 (a) provides: "In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights."

Thus, although the court was limited to matters occurring prior to March 1, 2012, to determine, pursuant to § 17a-112 (j) (1), whether the department had made reasonable efforts to reunify, or that the respondent was unable or willing to benefit from those reunification efforts, the court could consider matters occurring after the March 1, 2012 filing of the termination of parental rights petitions when it was considering the issue pursuant to § 17a-112 (j) (3) (B) (i) of whether the degree of the respondent's rehabilitation was sufficient to foresee that she could resume a proper parental role in the children's lives within a reasonable time. *In re Kyara H.*, supra, 147 Conn. App. 865.

[8] Another department social worker testified earlier in the trial that she had e-mailed the respondent's attorney notices of the respondent's failure to comply with the specific steps. Additionally, although the court allowed counsel to question the department social worker on cross-examination about who in the department was aware that the respondent's attorney was not contacted when the respondent did not attend the Exchange Club program, the court stated that it "may determine under all the circumstances that it carries no weight."

[9] By way of example, the respondent did not ask the court to articulate whether it found that the department failed to comply with any of the specific steps applicable to it.